Date signed April 23, 2010



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
## at Greenbelt

| | | |
|---|---|---|
| In Re: | * | |
| Bedford Town Condominium, | * | Case No.　10-15831-TJC |
| | * | Chapter　11 |
| | * | |
| Debtor | * | |
| ************************************ | * | |
| Bedford Town Condominium, | * | |
| | * | |
| | * | |
| Movant | * | |
| vs. | * | Motion　Docket No. 10, 17 |
| Washington Suburban Sanitary Commission, | * | |
| Potomac Electric Power Company | * | |
| | * | |
| Respondents | * | |

## MEMORANDUM OF DECISION

1

Before the Court is the Expedited Motion to Determine Adequate Assurance of Payment or to Modify Same (the "Motion") filed by Bedford Town Condominium (the "Debtor"). The Motion is opposed by Potomac Electric Power Company ("PEPCO") and Washington Suburban Sanitation Commission ("WSSC") (collectively the "Utilities").[1]

The Motion raises two issues: Under 11 U.S.C. § 366(c)(3)(A) of the Bankruptcy Code,[2] can the Court modify the adequate assurance required by the Utilities before the Debtor pays the requested amount. And if yes, should the Court modify the adequate assurance required by the Utilities in this case.

The Court held an evidentiary hearing on the Motion on April 15, 2010. There, the Court ruled preliminarily that the amount the Debtor proposed to pay the Utilities—$10,000 to each Utility payable in three monthly payments of $3,333—did not provide them with adequate assurance of payment. The Court continued the hearing to April 22, 2010 to enable the Debtor to explore additional means of providing adequate assurance to the Utilities.

For the reasons set forth herein, the Court concludes that the Debtor's payment of the adequate assurance required by the Utilities is not a condition precedent to the Court's authority to modify that amount under § 366(c)(3)(A). Further, the Court will order the Debtor to pay the Utilities a deposit equal to the average two-month service charges, as they require, but will allow the Debtor to pay it in monthly amounts as described herein. The Court will also order the

---

[1] The Motion also sought a determination of the adequate assurance payment for Washington Gas Co. Washington Gas did not respond to the Motion. On April 21, 2010, the Debtor filed an Expedited Motion to Sanction Washington Gas Company for Violation of the Automatic Stay Pursuant 11 U.S.C. § 362 and for Violation of 11 U.S.C. § 366(c). There, the Debtor alleged that Washington Gas issued a termination notice on April 16, 2010, prior to the expiration of the thirty-day injunction period described in 11 U.S.C. § 366(c)(2). That motion is set for hearing on April 28, 2010. Accordingly, issues concerning the necessary adequate assurance payment to Washington Gas will be addressed in the context of the expedited motion and not here.

[2] All statutory references hereinafter are to Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as currently in effect, unless otherwise noted.

Debtor to pay the Utilities timely for post-petition services and to apply the proceeds from a special assessment to unit holders toward the adequate assurance deposit.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

## Findings of Fact

The Debtor is a condominium regime that owns the Marylander, a 209 unit converted apartment complex located on Riggs Road in Adelphi, Maryland. The Debtor filed for Chapter 11 protection on March 19, 2010.

The Debtor's financial difficulties stem from two related problems. First, many unit owners do not pay their monthly assessments owed under the condominium rules. For example, during the months of January through March 2010, on average only 112 of 209 unit owners paid their assessments. The result is that the Debtor's monthly revenues range from $54,000 - $60,000, which is below the amount the Debtor needs to pay its monthly expenses. Second, units are not individually metered for utility service. The Debtor is billed for the utility services used in all units and common areas and pays those charges from the unit owners' monthly assessments. Consequently, residents have little economic incentive to limit their utility usage, and delinquent unit owners, and others, who do not pay assessments are free riding on the paying unit owners.

PEPCO and WSSC provide utility service to the Debtor. The Debtor's monthly PEPCO bill averages about $20,000, while its WSSC bill averages about $25,000. As a result of its economic difficulties described above, the Debtor was unable to pay its utility bills in full and on time. The exact amount the Debtor owed the Utilities as of the petition date has not been

3

determined, but the Debtor owed WSSC approximately $240,000 - $260,000 and PEPCO approximately $54,000 - $70,000.

Prior to January 2010, the Debtor's management did little to resolve its problems. In January, 2010, the Debtor hired Patrick Gallagher as its property manager. Mr. Gallagher is an experienced lawyer who has a real estate broker's license, and he has experience managing condominium associations with problems similar to those of the Debtor. He is working aggressively in an attempt to solve the Debtor's financial difficulties. He has taken, and continues to take, various steps to reduce the electric and water usage.[3] Gallagher is actively pursuing unit owners who have not paid their assessments. He solicited and received a proposal to replace all of the toilets in the units with low-flush toilets, which will generate substantial savings on water usage, and is negotiating to have that work done by payment over time from the savings generated. Lastly, he has built up the Debtor's cash position. As of January 8, 2010, when he became the property manager, the Debtor had $427 in its bank account. As of the hearing date, the Debtor had $84,270 in its account.

Gallagher's ultimate goal is to convert all of the units to individual metering, so that each unit owner, not the Debtor, is obligated to pay the utility service expense for the unit. However, his immediate problem is to stabilize the Debtor's net cash flow so that it can pay its post-petition obligations on a current basis while he attempts to resolve the Debtor's problems.

## Conclusions of Law

The Utilities contend that § 366(c)(2) and § 366(c)(3) mandate that the Court cannot modify the adequate assurance amount required by the Utilities until the Debtor pays the exact

---

[3] For example, non-residents continuously entered onto the premises to use the Debtor's private laundry facilities, which generated significant water and electric charges. Mr. Gallagher has put an end to that practice.

amount demanded by the Utilities.  Only then, according to the Utilities, can the Debtor seek an order modifying the amount of adequate assurance.  This Court disagrees.

The dispute centers on the meaning of §§ 366(c)(2) and 366(c)(3)(A).  Section 366(c)(2) provides:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility.

Section 366(c)(3)(A) provides:

> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

The meaning of § 366(c)(2) is clear: A utility may alter or discontinue service if it does not receive from the debtor within 30 days of the petition date adequate assurance that is satisfactory to it.  The statute is equally clear, however, that a utility's right to do so is expressly "subject to" § 366(c)(3).  That section allows the court to modify the amount of the assurance of payment required by the utility.

"It is an axiom of statutory construction that courts are obliged to give effect, if possible, to every word used by the legislature."  *Crestar Bank v. Neal* (*In re Kitchin Equipment*), 960 F.2d 1242, 1247 (4th Cir. 1992).  The Utilities' interpretation of these sections ignores the phrase "subject to paragraph[] (3)" in § 366(c)(2).  That phrase expressly makes a utility's right to alter service if it does not receive acceptable adequate assurance subject to modification by the Court.  The Utilities' interpretation of these sections is inconsistent with the "subject to" language.  Once a debtor pays the amount of adequate assurance required by a utility, the utility would lose the right to discontinue service by the express terms of § 366(c)(2), and there would be no need

5

to make its termination right "subject to" modification by § 366(c)(3).  Under the Utilities' view, their right to alter service if the debtor fails to pay adequate assurance that is acceptable to them is unfettered, and is not "subject to" modification by the Court.  But the statute states otherwise.

The Court further concludes that the language of § 366(c)(3)(A) itself does not support the Utilities' interpretation.  Under that subsection, the Court may modify the "amount of an assurance of payment under paragraph (2)."  The "amount of an assurance of payment under paragraph (2)" described in § 366(c)(3)(A) is the "adequate assurance of payment for utility service that is satisfactory to the utility" as stated in § 366(c)(2).  Thus, § 366(c)(3)(A) provides only that the Court may modify the amount of the adequate assurance of payment "that is satisfactory"—to use the language from § 366(c)(2)—to the utility.  It does not say "that is paid" to the utility, or any words to that effect.  Accordingly, the Court concludes that neither § 366(c)(2) nor (3)(A) require a debtor to pay the adequate assurance demanded by a utility before the Court can modify that amount.

The Utilities contend the changes to § 366 that were made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, were intended to provide them with greater assurance of payment.  To be sure, those changes gave substantial protection to public utility companies.  Section 366(c)(1)(A) lists acceptable forms of adequate assurance.  Section 366(c)(3)(B) identifies factors that the court may not consider in determining whether an assurance of payment is adequate.  As stated above, if a debtor fails to pay the adequate assurance required by the utility within the first thirty days of the case, the utility may discontinue service, subject to § 366(c)(3).  But these protections do not alter statutory language of §366(c)(2) and (c)(3)(A).  In addition to giving effect to the plain language of the statute, the interpretation adopted by the Court provides substantial protection to

a utility while at the same time providing an avenue of relief for debtors, who believe a utility's request is unreasonable or unworkable.  It is also consistent with 3 Collier on Bankruptcy, ¶ 366.03 (14th ed. 2008), which states that "Section 366(c)(3)(A) provides a procedure for contesting adequate assurance demand of the utility.  On request of a party and after notice and a hearing, the court may modify the amount of adequate assurance demanded by the utility."

The Utilities rely on *In re Pilgrim's Pride Corp.* (*Pilgrim's Pride*), 2009 Bankr. Lexis 2 (Bankr. N.D.Tex. 2009) and *In re Lucre* (*Lucre*), 333 B.R. 151 (W.D.Mich. 2005), to support their contention that the Court cannot modify the adequate assurance until their requested amount is paid by the Debtor.  *Pilgrim's Pride* does not support this contention; indeed, the holding is contrary to that position.  *See Pilgrim's Pride* at *8.  There the court addressed whether a utility that failed to object to a motion to determine adequate assurance of payment under § 366 was barred from later asserting that adequate assurance of payment was inadequate. *Id.* at *4.  The court ruled essentially that the matter was not ripe because the utilities had neither responded to the debtor's motion nor threatened to discontinue service.  *Id.* at *7-*8.  As pertinent to the issue raised here by the Utilities, the court first held that the utilities must provide reasonable notice of a change in service.  The court then explained that:

> As Debtors must therefore have at least reasonable notice of any utility's decision to terminate service, <u>Debtors will have an opportunity to negotiate adequate assurance with the utility or, if necessary, to invoke *Code § 366(c)(3)* to obtain a determination from the court respecting adequate assurance.  Pending a determination under *section 366(c)(3),* the court can, if necessary, provide temporary injunctive relief to preserve Debtors' estates and their respective businesses.</u>  Thus, full force and effect may be given to Code *366* without undue risk to Debtors and their economic constituencies.

*Id.* at *8 (emphasis added). Thus, the Court plainly did not interpret § 366 as requiring that a debtor must pay the adequate assurance payment as a precondition to the Court's authority to modify it.

In *Lucre*, the debtor filed a motion for authority to provide adequate assurance of future performance to utility providers. *Lucre*, 333 B.R. at 152. Debtor requested that the court continue the § 366(a) injunction against three utilities that failed to respond to its offers of adequate assurance. The court held that the "trustee or debtor in possession has no recourse to modify the adequate assurance payment the utility is demanding until the trustee or debtor in possession actually accepts what the utility proposes." *Id*. at 154. The court made this conclusory statement without specifically addressing the statutory language of § 366, and certainly without discussion of the phrase "Subject to paragraphs (3) and (4)" in § 366(c)(2).

Moreover, a number of courts have rejected the ruling in *Lucre*, concluding that its view of the statutory language would lead to absurd results. *See In re Circuit City Stores, Inc.*, 2009 WL 484553 (Bkrtcy. E.D.Va. 2009) ("Such an interpretation of § 366 is simply unworkable. It could lead to absurd results."); *In re Syroco Inc.*, 374 B.R. 60 (Bkrtcy. D. Puerto Rico 2007) ("We decline to follow the Lucre case because it is unreasonable to conclude that is what Congress intended the result to be."); *See also In re Beach House Property, LLC*, 2008 WL 961498 (Bkrtcy. S.D.Fla. 2008) ("An interpretation of §366 that precludes court intervention unless a debtor posts whatever amount is demanded could lead to absurd results and cannot be what Congress intended. . . . Instead, the Court finds that it has the authority to determine the form and amount of adequate assurance if the parties cannot reach agreement[.]"). The Court respectfully declines to follow *Lucre*.

For the foregoing reasons, the Court concludes that it can modify the adequate assurance required by the Utilities even though the Debtor has not yet paid that amount. The Court now turns to that issue.

Each Utility requires an adequate assurance deposit of twice the Debtor's average monthly service expense. The evidence at the hearing established the Debtor's average monthly service expense to be approximately $20,000 for PEPCO and $25,000 for WSSC. The amount of the adequate assurance deposit, therefore, would be $40,000 for PEPCO and $50,000 for WSSC. The Debtor initially proposed to provide to each Utility an adequate assurance deposit of $10,000, payable in three monthly payments of $3,333, but has increased that proposal to approximately $15,000.

The Debtor's amended proposed deposit does not provide the Utilities with adequate assurance of payment. At the early stage of this case, it appears that the Debtor's financial difficulties are directly tied to its utility charges, specifically to it prior inability to control charges for utility services and to pay utility charges on a timely basis. The Debtor was unable to pay timely its prepetition utility charges and owed substantial amounts to the Utilities as of the petition date.[4]

Further, the evidence established that the Debtor will struggle to meet its postpetition obligations, including those to the Utilities, at least until Mr. Gallagher's turnaround efforts provide some cash flow relief. Currently, the Debtor's average monthly collections are between $54,000 and $60,000. Mr. Gallagher testified that the Debtor's "break-even" collections amount is between $65,000 and $70,000. His immediate plan to attain the "break-even" collections

---

[4] Section 366(c)(3)(B)(ii) prohibits the Court from considering a debtor's history of making *timely* prepetition utility payment in determining adequate assurance. It does not prohibit the Court from considering *untimely* prepetition payments.

9

amount is to collect assessments from at least twenty or so, of the approximately 100, unit holders who are not paying their monthly assessments. He also is working to decrease expenses in the near term.[5]

The Court concludes that, ultimately, a two month utility deposit as required by the Utilities will provide adequate assurance of payment for utility service charges under the circumstances of this case. The Debtor, however, does not have the resources to make an adequate assurance payment in that amount at this time.

At the hearing on April 21, 2010, the Debtor stated it will make a special assessment to unit owners in the total amount of $20,000 for purposes of generating funds to provide the adequate assurance payment.[6] The Debtor anticipates that, if the same percentage of unit holders pay the special assessment as pay the monthly assessment (roughly 50%), the special assessment will generate $10,000 of funds for adequate assurance. The Debtor anticipates that the special assessment can be completed in sixty days.

The Court will fashion adequate assurance to the Utilities as follows:

(1) The Debtor must provide an adequate assurance deposit of $40,000 to PEPCO and $50,000 to WSSC;

(2) The Debtor shall pay the Utilities $3,333 per month by the fifth day of each month, beginning May, 2010, to be applied toward the adequate assurance deposit, until the deposit is paid in full from all sources;

---

[5] The evidence raises a concern of a potential administrative insolvency in this case. The Court anticipates that the Debtor's monthly operating reports will be closely monitored by the Utilities and the Office of the United States Trustee.

[6] At the initial hearing on April 15, 2010, the Court informed the Debtor at the close of evidence that $10,000 was inadequate and continued the hearing to allow the Debtor to explore other avenues of generating additional adequate assurance funds. The Court also ordered the Debtor to pay PEPCO and WSSC the post-petition bill for utility service charges issued by each. At the April 21, 2010 hearing, the Debtor informed the Court that payment was sent to the Utilities.

(3) The Debtor shall immediately proceed with the special assessment and the proceeds shall be paid pro rata to the Utilities to be applied to the deposit described above;

(4) The Court will enter an order requiring the Debtor to pay the Utilities the billed amount for all post-petition charges within ten days of the date of the bill;

(5) In the event the Debtor fails to pay the billed amount or make the $3,333 payment in accordance with this Memorandum, the Utilities may issue a notice of discontinuation of service, and in doing so must provide reasonable notice of termination.

The adequate assurance provided herein is without prejudice to any party's right to seek modification in the event circumstances dictate.

## Conclusion

The Court will enter an order consistent with this Memorandum of Decision.

cc:

John D. Burns, Esquire
The Burns Law Firm, LLC
6303 Ivy Lane Suite 102
Greenbelt MD 20770

William Douglas White, No. 01469
McCarthy & White, PLLC
1751 Pinnacle Drive, Suite 1115
McLean, VA 22102

Bedford Town Condominium
c/o Patrick Gallagher
7961 Riggs Road
Adelphi, MD 20783

Office of the United States Trustee
6305 Ivy Lane; Suite 600
Greenbelt, MD 20770

Potomac Electric Power Company, Inc.
Resident Agent
The Corporation Trust, Inc.
351 West Camden Street
Baltimore, MD 21201

Potomac Electric Power Company, Inc.
Renee Suglia, Esquire
1900 Pennsylvania Avenue, NW
Washington DC 20068

Washington Gas Light Company
A Public Utility
Ralph E. Fisher, Resident Agent
1800 N. Market Street
Frederick, MD 21701

Adrian P. Chapman, President
WGL Holdings, Inc.
101 Constitution Avenue, NW
Washington DC 20080

Lew Winarsky, Esquire (Via e-mail)
Counsel for Washington Gas
101 Constitution Avenue, NW
Washington DC 20080

Jerry M. Johnson, General Manager
Washington Suburban Sanitary Commission
14501 Sweitzer Lane
Laurel, MD 20707

Heather Ashbury, Esquire
Washington Suburban Sanitary Commission
14501 Sweitzer Lane
Laurel, MD 20707

**END OF MEMORANDUM**